UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

v.

05 Civ. 0650 (KMK)

WESTCHESTER COUNTY; WESTCHESTER
COUNTY BOARD OF ELECTIONS;
REGINALD LAFAYETTE, Commissioner of
the Westchester County Board of Elections; and
CAROLEE SUNDERLAND, Commissioner of
the Westchester County Board of Elections,

Defendants.

------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO EXTEND CONSENT DECREE

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street -- 3rd Floor
New York, New York 10007
Tel. No.: (212) 637-2733
Fax No.: (212) 637-2686

DAVID J. KENNEDY
Assistant United States Attorney

TIMOTHY F. MELLETT
Trial Attorney, Voting Section
United States Department of Justice

– Of Counsel –

## TABLE OF CONTENTS

Preliminary Statement ....................................................... 1

Background ................................................................. 2

A.  The United States Files Suit Against Westchester County for
    Failure to Provide Language Assistance ............................... 2

B.  The Provisions of the Consent Decree ................................. 4

C.  Westchester County's Failure to Fully Comply
    with the Consent Decree ............................................. 5

    1.  The 2005 General Election ..................................... 6

    2.  The 2006 Primary Election .................................... 10

    3.  The 2006 General Election .................................... 11

D.  Westchester County's Refusal to Agree Voluntarily to
    Extend the Consent Decree ......................................... 13

Argument .................................................................. 14

I.  This Court Has the Inherent Power to Extend the
    Consent Decree in Accordance with its Explicit Terms ................ 14

II. Good Cause Exists to Extend the Consent Decree
    to December 31, 2008 ............................................... 15

Conclusion ................................................................ 22

## Preliminary Statement

On July 19, 2005, this Court approved a Consent Decree between the United States of America and Westchester County that required Westchester County to provide Spanish-language assistance to voters, pursuant to Section 203 of the Voting Rights Act of 1965 ("Section 203"), as amended, 42 U.S.C. § 1973aa-1a, 42 U.S.C. § 1973aa-2, and 28 U.S.C. § 2201, and pursuant to Section 302 of the Help America Vote Act of 2002 ("Section 302" or "HAVA"), 42 U.S.C. §§ 15482, 15511.[1] The parties agreed that the Consent Decree "represent[ed] the parties' commitment to ensure that all citizens of Westchester County have an equal opportunity to participate in the electoral process, including Hispanic and Spanish-language citizens." (Exh. A, at 1.)

The United States now seeks to extend the Consent Decree. Paragraph 44 of the Consent Decree provides that the Decree "shall remain in effect through August 7, 2007; provided that upon motion made by the United States within thirty days of that date, the Decree shall be extended until December 31, 2008 for good cause shown." (Exh. A, ¶ 44.) The parties chose August 7, 2007 as the initial expiration date for the Consent Decree because at the time the Consent Decree was entered, the language assistance provisions of the Voting Rights Act – the authority upon which the relief was based – were set to expire on that date. See Voting Rights Language Assistance Act of 1992, Pub. L. No. 102-344 (Aug. 26, 1992). On July 26, 2006, however, Congress renewed the Voting Rights Act through August 6, 2032. See Fannie Lou

---

[1] A copy of the Consent Decree is annexed as Exhibit A to the Declaration of David J. Kennedy, dated Sept. 5, 2007 (hereinafter "Consent Decree"). The provisions of the Consent Decree relating to Section 203 of the Voting Rights Act were approved by a three-judge panel (the Hon. Barrington D. Parker, Circuit Judge, the Hon. Colleen McMahon, District Judge, and the Hon. John G. Koeltl, District Judge), and the provisions of the Consent Decree relating to Section 302 of the Help America Vote Act were approved by the Hon. Colleen McMahon.

Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246 (July 27, 2006) (the "Reauthorization Act"). Congress's renewal of the Voting Rights Act not only enables the United States to seek to extend the Consent Decree, but also reflects Congress's judgment that much remains to be done to guarantee the right to vote to all citizens, regardless of English language ability.

Westchester County exemplifies the basis of that judgment. Although Westchester County has improved its language assistance since the signing of the Consent Decree, it has yet to fully comply with all of its provisions. In the first general election following entry of the Consent Decree, in November 2005, there were widespread violations of the Consent Decree; Westchester County even failed to translate the official ballot into Spanish. Accordingly, good cause exists to extend the provisions of the Consent Decree through December 31, 2008. Without an extension of the decree, there is no procedure in place to permit the federal observer program to monitor polling sites to ensure that Westchester County is meeting its obligations under the law. The United States requested Westchester County's consent to an extension of the Consent Decree, but Westchester County has refused to consent. The United States is therefore constrained to make this application.

**Background**

A.    The United States Files Suit Against Westchester County for Failure to Provide Language
      Assistance

Since September 18, 1992, Westchester County has been covered by Section 203 of the

Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973aa-1a, with respect to the Spanish

language. See 28 C.F.R. 55, Appendix. On that date, the Director of the Bureau of the Census

determined that the County is a covered political subdivision for Hispanic citizens. See id.; see

also Letter from U.S. Department of Justice, Civil Rights Division, to Westchester County Board

of Elections, Sept. 21, 1992 (copy annexed as Exhibit B to the Kennedy Declaration). Because

Westchester County is subject to the requirements of Section 203, "any registration or voting

notices, forms, instructions, assistance, or other materials or information relating to the electoral

process, including ballots" that the County provides in English must also be provided in the

Spanish language so that Spanish-speaking voters can be effectively informed of and participate

in all voting-connected activities. 42 U.S.C. § 1973aa-1a.

On January 19, 2005, the United States filed suit alleging that Westchester County had

failed to meet its obligations under Section 203. (A copy of the Complaint is annexed to the

Kennedy Declaration as Exhibit C.) The United States alleged that Westchester County "failed

to provide, in the Spanish language, the information and assistance needed by Hispanic citizens

of limited-English proficiency to participate effectively in the electoral process." (Comp. ¶ 11.)

For example, Westchester County "failed to recruit, appoint, train, and maintain an adequate pool

of bilingual poll officials capable of providing effective language assistance to Hispanic citizens

with limited-English proficiency." (Comp. ¶ 11a.) Westchester County also

3

failed to translate into Spanish all election-related information, including but not limited to, announcements of election dates, information about voter registration, lists of polling place assignment, poll worker recruitment, notices of general, village and special elections, lists containing the name and residence of every candidate for public office to be voted for within its jurisdiction, and election-related information on the County's website, in particular the web pages for the Board of Elections.

(Comp. ¶ 11b.) These failures, the United States alleged, violated Section 203 of the Voting

Rights Act, 42 U.S.C. § 1973aa-1a (the "VRA").

The United States also alleged a claim under the Help America Vote Act of 2002

("HAVA"), alleging that in the November 2, 2004 general election for federal office,

Westchester County failed to comply with Section 302 of HAVA because it failed to post in each

polling place all of the voting information required by 42 U.S.C. § 15482(b), including

information regarding provisional ballots and the circumstances under which they may be cast.

(Comp. ¶ 13.)

B.     The Provisions of the Consent Decree

The parties settled the United States' suit by entering into a Consent Decree. On July 19,

2005, the Court approved a wide-ranging Consent Decree crafted to ensure that all citizens of

Westchester County, regardless of English language ability, would have an equal opportunity to

participate in the electoral process. To comply fully with the VRA, Westchester County agreed

to, among other things, the following provisions for bilingual assistance:

- •     "to provide in Spanish any 'registration or voting notices, forms, instructions, assistance or other materials or information relating to the electoral process, including ballots' that they provide in English in all elections and stages of the electoral process" (Consent Decree ¶ 1);

- •     "to ensure that both English and Spanish language election information, materials, and announcements provided by the County are made equally available" (id. ¶ 3);

4

- to "provide Spanish-language assistance, including but not limited to trained bilingual (Spanish/English) election personnel, at all locations where election-related transactions are conducted by the County" (id. ¶ 8);

- to ensure that "at each and every polling place in the County in which there are 100-249 registered voters with Spanish surnames there shall be staffed at least one poll official bilingual in Spanish and English" (id. ¶ 12a), with additional bilingual poll officials required commensurate with the number of registered voters with Spanish surnames (id. ¶¶ 12b, c);

- to train all poll officials regarding Westchester County's compliance obligations under the VRA and HAVA (id. ¶ 16a, c), and regarding "the requirement that poll officials be respectful and courteous to all voters regardless of race, ethnicity, color, or language abilities and to avoid inappropriate comments" (id. ¶ 16b);

To comply with HAVA, Westchester County further agreed to

> (1) permit individuals who declare that they are registered voters in the jurisdiction in which the individuals desire to vote and that they are eligible to vote in an election for Federal office but whose names do not appear on the official list of eligible voters in a particular polling place or whose eligibility is questioned by an election official, to cast a provisional ballot; (2) provide written information to voters who cast provisional ballots on how they are able to ascertain whether their vote was counted, and if the vote was not counted, the reason the vote was not counted; and (3) post in each polling place all information required by 42 U.S.C. § 15482(b).

(Id. ¶ 2.)  This information must also be in both English and Spanish.  (Id. ¶ 31.)

The Consent Decree also contained a specific provision allowing for its extension:

> This Decree shall remain in effect through August 7, 2007; provided that upon motion made by the United States within thirty days of that date, the Decree shall be extended until December 31, 2008 for good cause shown.

(Id. ¶ 44.)  As the United States has filed this motion on or before September 6, 2007, it is within

thirty days of August 7, 2007 and therefore timely.

C.    Westchester County's Failure to Fully Comply with the Consent Decree

Westchester County has yet to fully comply with the Consent Decree.  Since the Consent

Decree was signed, the United States has sent federal examiners and observers to monitor

5

elections in Westchester County, pursuant to paragraph 33 of the Consent Decree and Section

3(a) of the VRA, 42 U.S.C. § 1973a(a). These observers have monitored three elections: the

general election on November 8, 2005 (the "2005 General Election"); the primary election on

September 12, 2006 (the "2006 Primary Election"); and the general election on November 7,

2006 (the "2006 General Election"). With this motion, the United States is filing with the Court

three volumes of the complete reports of federal observers for each of these elections, with each

volume Bates numbered G05, P05, and G06 to designate the type of election and year. Based

upon the information obtained from the observers, it is clear that Westchester County has not yet

fully complied with the law or the Consent Decree.

1.     *The 2005 General Election*

There were widespread compliance problems with the Consent Decree in the 2005

General Election, the first election pursuant to the Consent Decree in which federal observers

participated.[2]

First, paragraphs 1 and 3 of the Consent Decree required Westchester County to provide

in Spanish any voting materials relating to the electoral process, "including ballots." (Consent

Decree ¶¶ 1, 3.) Westchester County did not do so. The official ballot was in English only.

Sometimes there were sample ballots in the Spanish language, see G05–214 (Eastview School,

White Plains), but sometimes there were no sample ballots at all, see G05–59 (Corpus Christi

School, Port Chester), 102 (John F. Kennedy Elementary School, Port Chester).

Second, paragraphs 1 and 3 required Westchester County to translate into Spanish all

---

[2] The United States did not send federal observers for the elections in September 2005, which were off-year, primary elections.

election-related materials.  (Consent Decree ¶¶ 1, 3.)  Westchester County failed to do so.

Specifically, federal observers reported that at certain polling sites, Westchester County provided

a wide array of election materials in English only, including signs indicating election hours

and/or date (missing at several polling places in Port Chester, see G05–5, 59, 102, 160, and in

White Plains, see G05–307), signs instructing how to cast one's ballot (missing at one polling

place in Yonkers, see G05-505), and even signs identifying the site as a polling place (Spanish-

language sign missing at one polling place in Port Chester, see G05–59).

    Third, paragraph 12 of the Consent Decree required Westchester County to assign

bilingual poll workers to polling sites whenever certain thresholds are met relating to the

numbers of voters at a site with Spanish surnames.  (Consent Decree ¶ 12.)  Westchester County

failed to do so.  Specifically, federal observers reported that the bilingual poll workers they

interviewed generally had received no specialized training on how to provide bilingual assistance

or on how to translate the ballot.  Observers encountered untrained bilingual poll workers at the

Brookville Apartments and Corpus Christi School in Port Chester (G05–20, 75), at St. Bernard's

Chapel in White Plains (G05–324), and at Schools No. 13 and No. 23 in Yonkers (G05–422,

477).  One designated poll worker at St. Bernard's Chapel in White Plains even told a federal

observer that she "would like training on how to properly translate forms and other information"

related to voting.  (See G05–325.)  In some instances, the designated bilingual poll workers were

not truly bilingual at all.  The designated bilingual pollworker at George Washington School and

several polling stations at School No. 13 in White Plains were able to converse in only

rudimentary Spanish.  (See G05–276, 426, 431.)  Because Westchester County failed to ensure

that bilingual election inspectors were on duty at polling sites with high numbers of registered

7

voters with Spanish surnames, it violated paragraph 12 of the Consent Decree.

Fourth, federal observers witnessed poll workers at several sites expressing their

confusion or annoyance at the posting of Spanish language materials or the provision of language

assistance to Spanish-language voters. Three poll workers reportedly made particularly

egregious remarks:

- At Brookville Apartments (Port Chester), observers witnessed a poll official prevent a Hispanic man from offering his assistance to his wife and daughter. After county officials intervened, that official allowed the man to provide assistance, but commented that the Hispanic family involved were "pains in the ass." (See G05–23, 30, 32.)

- At School No. 13 in White Plains, a poll worker for Ward 8 told observers: "I don't know why we have to put these [Spanish language signs] up. They [Hispanics] should be able to speak English. This is an English speaking country." (See G05–423.)

- At School No. 13 in White Plains, a poll worker for Ward 2 told observers: "You have no business making two ballots in different languages." (See G05–423.)

The Consent Decree requires the county to train "all poll officials and other election personnel

present at the polls" regarding (1) "the provisions of Section 203 of the Voting Rights Act,

including the legal obligation and means to make Spanish-language assistance and materials

available to voters" and (2) "the requirement that poll officials be respectful and courteous to all

voters regardless of race, ethnicity, color, or language abilities and to avoid inappropriate

comments." (See Consent Decree ¶ 16.) Westchester County either failed to comply with these

provisions, or the poll officials who received this training ignored it.

Because the Consent Decree recognizes "that regular and ongoing reassessment may be

necessary to provide the Spanish-language minority voters with equal access to all phases of the

electoral process," (Consent Decree ¶ 37), the United States wrote to Westchester County by

8

letter dated February 17, 2006 to detail Westchester County's violations of the Consent Decree in the 2005 General Election. (A copy of that letter is annexed as Exhibit D to the Kennedy Declaration.) Westchester County responded by letter dated March 24, 2006, advising that (1) the reason the official ballot was not in Spanish was because it was not mechanically feasible to translate the official ballot given Westchester County's machines; (2) Westchester County did provide bilingual material to its pollworkers; (3) it would investigate the lack of Spanish-language fluency among certain pollworkers; and (4) it would investigate the incidents of inappropriate comments by pollworkers. (A copy of that letter is annexed as Exhibit E to the Kennedy Declaration.) That letter also faulted the United States for not immediately advising Westchester County that bilingual material was missing, stating: "Had the County been promptly informed of these observations, the matters could have been readily addressed and/or remedied as the County maintained trained staff available for such a response." (Kennedy Decl. Exh. E, at 5.)

Counsel for the United States met with Westchester County Commissioners and counsel on August 14, 2006, to address the problems noted in the 2005 General Election. At that meeting, the parties agreed, among other things, that: (1) Westchester County would provide a bilingual machine ballot for the September 12, 2006 primary elections and, to the extent possible, for the November general election and if it could not do so, would affix a laminated bilingual sample ballot inside each voting booth; (2) Westchester County would provide election workers with a checkoff list specifying each of the bilingual notices that must be posted to ensure that all required material is posted; (3) Westchester County would correct errors in Spanish language and grammar noted by the United States in Westchester County's election materials; (4) Westchester County would conduct an informal interview in Spanish with election workers to determine that

9

such workers are indeed fluent in Spanish, before designating such workers as bilingual, and implement a system to keep track of which election workers are bilingual. (A copy of that letter is attached as Exhibit F to the Kennedy Declaration.)

2.    *The 2006 Primary Election*

Various problems persisted through the 2006 Primary Election, during which federal observers monitored elections at Peekskill and Yonkers. Some materials were missing entirely, specifically at Yonkers Museum School 25 (see P06–281) (notices advising voters of assistance, election date and hours, sample ballot, instructions regarding provisional ballot all missing, in both Spanish and English). Spanish-language was present more frequently than in 2005, but on several occasions it was not equally visible as English-language material, specifically at Peekskill Middle School (see P06–49) (sample ballot not equally visible).

At several polling places, bilingual poll workers assigned to one election district did not know that they could provide language assistance to voters at another election district at the same polling place (see, e.g., P06-253 (Lincoln High School, Yonkers); P06-356 (Sauderton High School, Yonkers)), and on some occasions failed to do so (see, e.g., P06-253 (Lincoln High School, Yonkers)). At one polling place, two representatives from the Westchester County Board of Elections eventually arrived and explained to the pollworkers that bilingual polling officials stationed at one election district could make themselves available to voters needing assistance from other districts. (See P06-356 (Sauderton High School, Yonkers).) The representatives of Westchester County reportedly stated to federal observers: "We are here because of you." (Id.)

There was a continuing problem of untrained pollworkers. At Yonkers Museum School

10

25, both bilingual poll workers stated that they were hired the night before the election, and had not received any training. (P06–299, 300; see also P06–204, 205 (at Yonkers Early Childhood Center, two of the four bilingual pollworkers stated they received no training)). At Peekskill Middle School, the "bilingual" pollworker was not able to carry on a conversation in Spanish, offering the excuse that, "I can understand in Spanish better than I can speak." (P06–68.) Certain pollworkers also appeared unfamiliar with the requirements of the Voting Rights Act and the Consent Decree. At Colombian Hose Fire House (Peekskill), one pollworker told the bilingual pollworker: "I think if they come to this country they should speak our language." (P06–22.) Other pollworkers appeared not to have been trained on interacting with federal observers.[3] One pollworker at Lincoln High School in Yonkers stated that primary day "was the first time she hear[d] about federal observers" (see P06–250); see also P06–204 (noting pollworker's initial refusal to answer any questions of federal observers at Yonkers Early Childhood Center); P06–67 (same, at Peekskill Middle School).

Finally, federal observers noted an instance in which a voter at Uriah Hill Elementary School in Peekskill was denied an affidavit ballot, in violation of HAVA and Consent Decree ¶ 2. (See P06–157.)

3. *The 2006 General Election*

Many of the same problems noted in the 2006 Primary Election persisted into the 2006 General Election, for which all of the federal observers monitored polling places in Yonkers.

---

[3] The Consent Decree expressly states that Westchester County "shall recognize the authority of federal observers to observe all aspects of voting conducted in the polls on election day, including the authority to view County personnel at all polling places providing assistance to voters during voting, except where the voter objects." (Consent Decree ¶ 34.)

Provisional ballots and instructions for provisional voting were not provided in Spanish (see G06–287 (Rene Burke, Yonkers) (provisional ballot in English only); G06–83 (Fermi Middle School, Yonkers) (provisional ballot in English only); G06–330 (Sauders Trades High School, Yonkers) (provisional ballot notices missing in both languages); G06–374 (St. John's Riverside Hosp., Yonkers) (provisional ballot notices missing in both languages)), in violation of the Voting Rights Act, HAVA, and paragraph 31 of the Consent Decree. At several polling sites other election-related material was provided in English only; for example, at Corpus Christi Church in Yonkers, the only election-related material that was bilingual was the direction to the polling place. (See G06–4; see also G06–200 (election date and hours sign missing, in both languages, at Museum Jr. High School, Yonkers); G06–374 (same, at St. John's Riverside Hosp., Yonkers).)

Yet again, there were bilingual poll workers who had not been trained nor were actually bilingual. (See G06–15 (Corpus Christi Church, Yonkers) (no specialized training for bilingual poll workers); G06–44 (Early Childhood Center, Yonkers) (same); G06–218 (Museum Jr. High School, Yonkers) (same); G06–265 (Nadine Hill Center, Yonkers) (same); see also G06–138 (Lincoln High School, Yonkers) ("bilingual" poll worker did not speak English).) Federal observers also noted one occasion where a daughter was prevented by election inspectors from going inside the voting booth to assist her mother in casting her vote. (G06–452 (Sunset Green, Yonkers).)

Counsel for the United States met with counsel for Westchester County on November 6, 2006, to review issues that had arisen in the 2006 Primary Election and to establish clear lines of communication for the 2006 General Election. (Kennedy Decl. ¶ 8.) Throughout election day,

12

counsel for the United States received reports from election observers and relayed them directly
to counsel for Westchester County via email. Among the information conveyed was that: (1)
signs (in both languages) were missing at Martin Luther King School and Saunders Trade School
in Yonkers (email sent at 11:20 a.m.); (2) at Lincoln High School in Yonkers, two of the
"bilingual" poll workers did not speak English (email sent at 1:24 p.m.); (3) a large number of
uniformed officers, including police officers, firefighters, and correctional officers, some of
whom carried firearms, entered Lincoln High School and the Nepperhan Community Center
(emails sent at 11:11 a.m. and 4:41 p.m.); (4) at the Yonkers Police Athletic Center site, there
was a large group of poll watchers from one party challenging every voter at the site (email sent
at 7:07 p.m.); and (5) a review of the observer report for the Sunset Green polling place indicated
that poll workers prevented a voter from receiving assistance from her daughter (email sent at
11:41 p.m.). (Copies of these emails are annexed to the Kennedy Declaration as Exhibit G.)

D.     Westchester County's Refusal to Agree Voluntarily to Extend the Consent Decree

In anticipation of the extension date for the Consent Decree, counsel for the United States
wrote to Westchester County on July 10, 2007. (A copy of this letter is annexed as Exhibit H to
the Kennedy Declaration.) That letter advised Westchester County of the extension deadline,
explained that the Reauthorization Act had been passed, and requested Westchester County's
consent to the extension. (Id.) Westchester County did not respond to this letter. (See Kennedy
Decl. ¶ 11.) On August 7, 2007, counsel for the United States contacted counsel for Westchester
County by phone to advise that there had been no response to the letter of July 10th, and to ask
whether Westchester County would consent to an extension of the Consent Decree. (See id. ¶
12.) Counsel for Westchester County advised that it would not consent. (See id.)

13

Before filing this motion, the United States provided Westchester County with a last opportunity to consent to an extension of the Consent Decree. On August 28, 2007, the United States sent by overnight mail all three volumes of observer reports, and on August 29, 2007 sent a draft of this memorandum of law, and a proposed stipulation extending the Consent Decree, and advised Westchester County that it would file this application not later than September 5, 2007. (A copy of the cover letter to that mailing is annexed as Exhibit I to the Kennedy Declaration.) Westchester County has not consented. Accordingly, the United States now files this application.

## Argument

I.    This Court Has the Inherent Power to Extend the Consent Decree in Accordance with its Explicit Terms

There is no question that the Court has the power to extend the Consent Decree. See, e.g., Spallone v. United States, 493 U.S. 265, 276 (1990) (courts have inherent power to enforce compliance with their consent decrees). "Consent decrees have elements of both contracts and judicial decrees." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (citing Firefighters v. Cleveland, 478 U.S. 501, 519 (1986)). A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992). The parties expressly recognized these legal principles in paragraph 45 of the Consent Decree:

> The Court shall retain jurisdiction of this case for the term of the Decree to enter further relief or such other orders as may be necessary for the effectuation of the terms of this agreement, to resolve any disputes that may occur during the term of this Decree, and to ensure compliance with Section 203 of the Voting Rights Act

14

and Section 302 of HAVA.

(Consent Decree ¶ 45.) An extension of the Consent Decree is well thus within the Court's equitable powers.

In addition, the parties expressly provided for an extension of the Consent Decree.

Paragraph 44 of the Consent Decree specifies:

> This Decree shall remain in effect through August 7, 2007; provided that upon motion made by the United States within thirty days of that date, the Decree shall be extended until December 31, 2008 for good cause shown.

(Consent Decree ¶ 45.)[4] It is no accident that the date set forth in the Consent Decree is the very same date that the language assistance provisions of the Voting Rights Act were due to expire. See Voting Rights Language Assistance Act of 1992, Pub. L. No. 102-344 (Aug. 26, 1992). On July 26, 2006, however, Congress renewed the Voting Rights Act through August 6, 2032. As Congress subsequently passed the Reauthorization Act, see Reauthorization Act, Pub. L. No. 109-246, the Consent Decree should likewise be reauthorized, to the date previously agreed upon by the parties.

## II. Good Cause Exists to Extend the Consent Decree to December 31, 2008

The United States seeks to extend the Consent Decree because of the importance of the right to vote in a democracy, and because Westchester County has not adequately complied with the Consent Decree. Westchester County's failure to comply with the Consent Decree not only deprived the United States of the benefit of the bargain that it struck in 2005, but also denied

---

[4] To alter or amend a consent decree, the moving party typically must show "changed circumstances." Rufo, 502 U.S. at 391. This standard does not apply here because the United States does not seek to alter or amend the Consent Decree, merely to extend it to a point in time already contemplated by the parties and ordered by the Court in the Consent Decree. The standard agreed upon by the parties to extend the Consent Decree is "good cause."

15

equal access to the ballot to Westchester County's over ten thousand Hispanic citizens of voting age who do not speak English well enough to participate effectively in an English-only election process. (Consent Decree at 2 (fifth "Whereas" paragraph).) Extending the Consent Decree will enable federal observers to determine whether Westchester County fully complies with the law, which it has yet to do.

First, there is good cause to extend the Consent Decree because of the fundamental importance of guaranteeing equal access to the ballot. The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555 (1964). Consequently, "[t]he deprivation or dilution of voting rights constitutes irreparable harm." Coleman v. Board of Educ. of the City of Mount Vernon, 990 F. Supp. 221, 226 (S.D.N.Y. 1997); see also Puerto Rican Legal Defense & Educ. Fund, Inc. v. City of New York, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) ("[I]t is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm.").

The language provisions of the Voting Rights Act play an integral part in guaranteeing equal access to the ballot for all citizens, regardless of race, ethnicity, or language ability. The Supreme Court has instructed that the provisions of the Voting Rights Act must be broadly construed. See Allen v. State Board of Elections, 393 U.S. 544, 565 (1969). Consistent with this instruction, courts have actively enforced the language provisions of the Voting Rights Act. See, e.g., United States v. Berks County, 250 F. Supp. 2d 525, 538-40, 542 (E.D. Pa. 2003) (preliminarily enjoining county election based upon, among other things, county's "English-

16

only" election materials and failure to permit language assistance by family members); United States v. Metropolitan Dade County, 815 F. Supp. 1475, 1477-79 (S.D. Fla. 1993) (finding Florida county in violation of language provisions of Voting Rights Act for failure to print election material in Spanish). As this Court recognized long ago:

It is simply fundamental that voting instructions and ballots, in addition to any other material which forms part of the official communication to registered voters prior to an election, must be in Spanish as well as English, if the vote of Spanish-speaking citizens is not to be seriously impaired. Simple logic also requires that the assistance given to the plaintiff class of voters at the polls on election day by trained representatives of the Board of Elections be in a language they understand, in order that their vote will be more than a mere physical act void of any meaningful choice.

Torres v. Sachs, 381 F. Supp. 309, 312 (S.D.N.Y. 1974) (ordering the New York City Board of Elections to provide Spanish language materials and assistance). As a preliminary matter, Westchester County was notified on September 21, 1992, that it was subject to the bilingual requirements of Section 203 of the Voting Rights Act. (Kennedy Decl. Exh. B.) Having been on notice for almost fifteen years that it must comply with the law, Westchester County has no excuse for its failure to achieve full compliance. Ensuring that Westchester County allows all of its citizens to vote on an equal basis constitutes good cause to extend the Consent Decree to December 31, 2008.

Second, the Consent Decree should be extended because Westchester County did not initially comply with it, and even now has yet to attain full compliance. Consent decrees are subject to ongoing court supervision and enforcement. See Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985); see also EEOC v. Local 580, International Ass'n of Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 593 (2d Cir. 1991) ("[T]hough a court cannot randomly

17

expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad."). This Court's duty to protect the integrity of the Consent Decree "justifies any reasonable action taken by the court to secure compliance." Berger, 771 F.2d at 1568 (internal quotes omitted). Moreover, "[c]ourts have an affirmative duty to protect the integrity of a court decree where the performance of one party threatens to frustrate the purpose of the decree." Barcia v. Sitkin, 79 Civ. 5831 (RLC), 79 Civ. 5899 (RLC), 2007 WL 222003, at *3 (S.D.N.Y. Jan. 25, 2007) (citing Berger, 771 F.2d at 1568); see also Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1018 (6th Cir. 1994) ("The injunctive quality of a consent decree compels the approving court to: (1) retain jurisdiction over the decree during the term of its existence, (2) protect the integrity of the decree with its contempt powers, and (3) modify the decree if 'changed circumstances' subvert its intended purpose."); Local 580, 925 F.2d at 593 ("Until parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion – pursuant to its independent, juridical interests – to ensure compliance."). Westchester County's failure to fully comply with the Consent Decree violates the integrity of the decree and supplies good cause for an extension.

There is no question that Westchester County did not comply with the Consent Decree the year that it was signed. The 2005 General Election was rife with violations, including:

- an English-only official ballot;

- English-only signs at certain polling places;

- "bilingual" poll workers who were untrained or not actually bilingual;

- pollworkers who made inappropriate and offensive comments, such as referring to family members providing assistance to one another as "pains in the ass," and expressing disregard or contempt for the language provisions of the Voting Rights

18

> Act: "I don't know why we have to put these [Spanish language signs] up. They [Hispanics] should be able to speak English. This is an English speaking country," and "You have no business requiring ballots in different languages."

(See supra Section C.1.) The fact that the United States embarked upon a cooperative and constructive path to correcting these failures does not excuse Westchester County's violations.

There is likewise no question that Westchester County failed to fully comply with the Consent Decree for the 2006 Primary Election and 2006 General Election. The same problems recurred in these two elections:

- missing signs at certain polling places;
- "bilingual" poll workers who were untrained or not actually bilingual;
- provisional ballots and instructions for provisional voting were missing, or not provided in Spanish.

(See supra Section C.2-3.) Indeed, during the 2006 Primary Election certain representatives of Westchester County reportedly stated to federal observers: "We are here because of you." (Sauderton High School (Yonkers), at P06–356.) Although the context of that remark appears to be that Westchester County sent representatives to advise bilingual poll workers assigned to one election district that they could assist voters needing assistance who voted at other election district, the remark also suggests that continued federal observation tends to improve Westchester County's compliance with the law.

Westchester County's failure to comply with the Consent Decree for the 2005 General Election, the 2006 Primary Election, and 2006 General Election – all three elections monitored by federal observers pursuant to the Consent Decree – constitutes good cause to extend the Consent Decree. "[A] consent decree is an order of the court and thus, by its very nature, vests

19

the court with equitable discretion to enforce the obligations imposed on the parties." United States v. Local 359, United Seafood Workers, 55 F.3d 64, 69 (2d Cir. 1995) (affirming retroactive extension of term of administrator under RICO consent decree, and affirming sanctions against defendants, based upon defendants' failure to comply with consent decree); see also David C. v. Leavitt, 242 F.3d 1206, 1210 (10th Cir. 2001) (extending term of consent decree based upon State's noncompliance, explaining that "a court's equitable modification power extends to material provisions in a consent decree"); Barcia, 2007 WL 222003, at * 3 (granting in part plaintiff's motion to enforce and extend consent decree based upon defendants' non-compliance).[5]

In entering into the Consent Decree, the United States gave up a judicially imposed remedy, which could have been more expensive and onerous for Westchester County. Having obtained the benefit of that bargain, Westchester County should have fully complied with its obligations under the Consent Decree: "A defendant who has obtained the benefits of a consent decree – not the least of which is the termination of the litigation – cannot then be permitted to ignore such affirmative obligations as were imposed by the decree." Berger, 771 F.2d at 1568. Extending the Consent Decree is particularly appropriate because the more elections that are held in a manner that complies with Section 203, the more election officials, pollworkers, and voters will understand and anticipate that elections will be conducted in a manner that is equally accessible to those who do not speak English.

---

[5] The Court need not find Westchester County in contempt to extend the Consent Decree, notwithstanding the lack of compliance therewith. "Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." Berger, 771 F.2d at 1568 (citations omitted).

Finally, there is good cause for the Court to order the specific remedy sought by the

United States: an extension of the Consent Decree to December 31, 2008. Where "a right and a

violation have been shown, the scope of a district court's equitable powers to remedy past

wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Berger, 771 F.2d

at 1568 (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971)). These

powers are particularly broad where, as here, a consent agreement is aimed at remedying

discrimination. See Spallone, 493 U.S. at 276 (court can exercise "broad equitable powers"

when enforcing compliance with a decree aimed at remedying past discrimination). In this case,

the remedy requested by the United States is the one previously recognized by both parties. The

parties to the Consent Decree specifically contemplated that an extension of the Consent Decree

would run to December 31, 2008. (Consent Decree ¶ 44.) Ordering this remedy is thus well

within the Court's equitable powers.

The circumstances of next year's elections also supply good cause to extend the Consent

Decree.[6] 2008 promises to be a highly competitive election year. In 2008, both of the major

political parties are anticipated to have hotly contested primaries in the spring, an additional

round of primaries is likely for the fall, and most significant of all, a national presidential election

in November 2008 in which, for the first time since 1952, neither candidate is the incumbent

President or Vice-President. The election cycle covered by the extension sought by the United

States is one of the most important election cycles in recent years. To guarantee that all of

Westchester County's citizens will have their voices heard in it, the Court should extend the

---

[6] There are primary elections currently scheduled for September 18, 2007. The United
States would consider observing the November 6, 2007 general election if the Consent Decree is
extended.

21

Consent Decree to December 31, 2008.

## Conclusion

For the foregoing reasons, the Court should (i) find that there is good cause to extend the

Consent Decree; and (ii) extend the Consent Decree through December 31, 2008. The United

States has respectfully submitted a proposed order with this application.

Dated:     New York, New York
           September 5, 2007

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York

                    By:

                              DAVID J. KENNEDY (DK-8307)
                              Assistant United States Attorney
                              86 Chambers Street -- 3rd Floor
                              New York, New York 10007
                              Tel. No.: (212) 637-2733
                              Fax No.: (212) 637-2686
                              david.kennedy2@usdoj.gov

TIMOTHY F. MELLETT
Trial Attorney, Voting Section
United States Department of Justice
  – Of Counsel –

22